# United States District Court

for the
Western District of Wisconsin

ANTONE BESSY and KANASHA WOODS,
on behalf of themselves and all others similarly situated, Plaintiffs

v.

PER MAR SECURITY AND RESEARCH CORP, Defendant

Case No. 17-CV-00034

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION

## I.      SUMMARY OF POSITION

Named Plaintiffs Antone Bessy and Kanasha Woods, former Special Events employees who worked out of Defendant Per Mar Security and Research Corp's ("Per Mar") Milwaukee branch, allege that Per Mar violated the Fair Labor Standards Act ("FLSA") by using an improper method to calculate their rate of pay when determining their overtime compensation (a rate based on the work being performed at the time of the overtime, rather than a blended rate for the entire work week); and, by utilizing an "unwritten policy" of having supervisors underreport employees' hours of work.  Doc. #28 at 4, 10.  They seek conditional certification of two collective three-year classes for alleged violations of the FLSA: 1) for alleged violations based upon the improper calculation of the overtime rate, a nationwide collective class consisting of all current and former "hourly job site" employees; and, 2) for alleged violations based upon the claimed "unwritten policy" of failing to accurately record employees' hours of work, a collective class consisting of all current and former "hourly job site" employees who worked for one of Per Mar's Wisconsin branches.[1]  Doc. #28 at 4,

---

[1] Plaintiffs apparently do not seek conditional certification of any class under Rule 23, as alleged in their First Amended Complaint, for alleged violations of Wisconsin state law.  Doc. #18 at ¶¶ 33-39, 48-57.

10, 15; Doc. #30, 32.  Plaintiffs base their Motion solely on Declarations from Plaintiffs' counsel and Named Plaintiff Bessy, and speculation stemming from those declarations.

Defendant objects to conditional certification of the "overtime rate" class because members of the proposed national class are not "similarly situated."  Defendant further objects to the certification of any nationwide class for the alleged overtime rate violation because there is no evidence to support it.  Plaintiffs' sole support for an alleged nationwide class consists of a misrepresentation by Plaintiffs' counsel about the Court's August 9, 2017 Order resolving his Motion to Compel and Defendant's response to that Order, which is not evidence.

Defendant also objects to the certification of any Wisconsin class based upon the recording of employees' hours of work because there is no evidentiary basis to support it.  The only evidence the Plaintiffs offer of the alleged "unofficial policy" of underreporting employees' hours of work is speculation from Named Plaintiff Bessy and Plaintiffs' counsel based upon the placement of other employees' names in the time sheets for a single event, completed by a single supervisor.  They have offered no evidence from any of those employees, or any other employee for that matter, to demonstrate that their hours of work were not accurately recorded and/or that they were not properly paid as a result.  In fact, the actual time sheets from which Bessy and Plaintiffs' counsel speculate demonstrate just the opposite, as does a Declaration from Dakota Stephany, the primary source of Plaintiffs' speculation.

Moreover, the "evidence" offered by Plaintiffs of an alleged unofficial policy of underreporting employees' hours of work at all of the Wisconsin branches consists of the actions of by a single supervisor for single event attended by employees from several branches – which is clearly insufficient to establish the existence of a "common policy or plan," or to show that Bessy was "similarly situated" to anyone.  Lastly, resolution of the claim on a class basis is not appropriate

because the determination of each of the 1,752 putative class members' claims would require an individualized assessment of each member's entries on each day they worked, coupled with a determination as to whether the actually worked those hours on that date.

Defendant further objects to the proposed notices Plaintiffs request the Court to approve.

## II.   RELEVANT FACTS

Per Mar provides security services to business and residential customers located throughout the Midwest, with twenty-three branch locations in thirteen states.  It provides home and business security systems, as well as security guard services, among others.  It has five branch offices in Wisconsin that provide security guard services:  Eau Claire, Green Bay, Madison, Milwaukee and Wausau.  Declaration of Lori Ryden, ¶ 2 ("Dec. Ryden, ¶ #").

Per Mar provides two types of security services, permanent uniformed security guards and special event officers.  Permanent uniformed guards perform security services at set locations on a regular and continuing basis, with established work schedules and hours.  They undergo extensive training, are licensed in accordance with applicable state regulations, and are often armed.  Dec. Ryden, ¶ 3.

Special Event employees are not licensed. They provide a variety of services on an event basis (*e.g.*, church festivals, music festivals, sporting events, etc.), including security, crowd control, parking services, ticket taking, ushers, etc.  Their work schedules, hours of work, and rates of pay are dependent on the event at which the services are being provided. Permanent guards may, on occasion, perform services at special events, but Special Events employees do not provide security services for permanent or temporary clients.  Dec. Ryden, ¶ 4.

Per Mar has three types of clients at the Wisconsin branches, permanent clients, temporary clients and special events clients.  Approximately 94% of the work performed by employees at the

Wisconsin branches are performed for permanent and temporary clients, which are staffed by permanent uniformed security guards.  Dec. Ryden, ¶ 5.

Permanent clients are clients for whom Per Mar performs security services on a regular and continuing basis. Security officers assigned to permanent clients are licensed security guards who generally work established schedules and hours.  Dec. Ryden, ¶ 6.

Temporary clients are clients for whom Per Mar performs security services for a specific period of time ranging from overnight to several months.  The services provided are temporary due to the temporary needs of the client.  Examples include construction sites and holiday additional coverage. Security officers assigned to temporary clients are licensed security guards who work established work schedules and hours depending on the length of coverage.  Dec. Ryden, ¶ 7.

Special event clients are clients for whom Per Mar performs security services on an event basis and generally occur more in the summer months. Personnel who work special events are not required to be licensed security guards, but the licensed guards who work for permanent clients also have the opportunity to work special events, if desired. Dec. Ryden, ¶ 8.

Security officers who perform work for permanent and temporary clients are required to record their hours of work electronically through TeamTime or eHub Mobile, or through paper timesheets if they do not have access to the electronic systems. TeamTime is a timekeeping system that allows officers to clock in through a designated cell phone by responding to a series of automated prompts (*e.g.*, employee number, start/end time, job number, etc.). eHub is an electronic timekeeping system that operates through an app on an employee's cellphone. Employees open the app, click on a time clock icon, then a start or end icon, and then the appropriate job number, at which time they are clocked in (or out). Dec. Ryden, ¶ 10-12, Exhs. 1, 2.

Employees who clock-in using TeamTime or eHub Mobile have the ability to review the prior day's hours via eHub Mobile. In addition, the total number of hours worked for the biweekly pay period is noted on the employee's paystub. Dec. Ryden, ¶ 13.

Employees who perform services at special events are required to record their hours worked on a paper sign-in sheet. Timesheets are blank and include an area for the employee to record his/her actual hours worked and an area for the employee to sign and confirm that the entries are accurate. Dec. Ryden, ¶ 14. The total number of hours worked for the biweekly pay period is noted on the employees' paystub. The event employees may contact the branch (or human resources) and request confirmation of hours worked at any time. Dec. Ryden, ¶ 15.

Paper timesheets are used mainly at special event sites.  Very rarely, paper timesheets are used at permanent accounts when phones are not available. Dec. Ryden, ¶ 16.

All of the branches in Wisconsin follow the same timekeeping procedures for security officers working for permanent and temporary clients. That is, they are required to record their hours of work through TeamTime or eHub Mobile, and only use paper timesheets when they do not have access to the electronic systems, which is rare.  Each branch uses paper timesheets for special events, but the form of those timesheets vary from branch to branch. See, Dec. Spangler, ¶ 8, 10, Exhs. 1, 2 (Milwaukee); Dec. Schaeffer, ¶ 8, 10, Exhs. 1, 2 (Madison); Dec. Pingel, ¶ 8, 10 Exhs. 1, 2 (Green Bay); Dec. Hubbard, ¶ 8, 10 (Eau Claire); Dec. Thacker, ¶ 8, 10 (Wausau).

According to the established policy of Per Mar, supervisors are not permitted to complete timecards on behalf of employees. In the event a supervisor does, however, complete a timecard on behalf of an employee, he/she is required to record the hours actually worked by the employee, not simply the hours they were scheduled to work. See, Dec. Ryden, ¶ 17; Dec. Spangler, ¶ 12, 14 (Milwaukee); Dec. Schaeffer, ¶ 12, 13 (Madison); Dec. Pingel, ¶ 12, 13 (Green Bay); Dec.

Hubbard, ¶ 12, 13 (Eau Claire); Dec. Thacker, ¶ 12, 13 (Wausau).

Bessy worked as a Special Events officer at the Milwaukee branch from June 29, 2016 through September 29, 2016.  The events that he worked during his employment, and the hours he worked at those events are reflected in the time sheets that were completed for each event.  The actual time sheets used to record his hours varied by event, as did the manner in which they were recorded.  Most often, the time sheets contained entries for the scheduled shift start, along with the actual shift start and end times, followed by a signature from the employee confirming their accuracy.  Dec. Spangler, ¶ 16, Exh. 3.

Bessy worked at a music festival in Eau Claire from August 11, 2016 through August 13, 2016.  Because it was a very large event, security officers from a number of the branches signed up for the work, and were supervised at the event by ███████, a security officer out of the Wausau branch.  It was the only event at which ███ served as Bessy's supervisor.  Dec. Spangler, ¶ 17.

## III.   ARGUMENT

### A.  Governing Legal Standards

The FLSA authorizes employees to bring collective actions to recover unpaid overtime compensation on behalf of themselves and "other employees similarly situated."  29 U.S.C. § 216(b).  District Courts in the Seventh Circuit have adopted a "two-step approach" to determine whether certification of a collective class is warranted.  *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 605 (W.D. Wis. 2006).  In the first step, Plaintiffs must demonstrate a reasonable basis for believing that they are similarly situated to potential class members, and "that they are all 'victims of a common policy or plan that violated the law.'"  *Bitner v. Wyndham Vacation Resorts, Inc.*, 301 F.R.D. 354, 358 (W.D. Wis. 2014), citing *Freeman v. Total Sec. Mgmt.-Wis., LLC*, No. 12-cv-461-wmc, 2013 U.S. Dist. LEXIS 112871, at *12 (W.D. Wis. Aug. 9, 2013).  In this step, "the central

question is whether potential plaintiffs 'are sufficiently similar to believe a collective action will facilitate efficient resolution of a legal dispute involving claims which share common questions and common answers.'"  *Bitner* at 358, citing *Berndt v. Cleary Building Corp*., No. 11-cv-791-wmc, 2013 U.S. Dist. LEXIS 91619, at *21-22 (W.D. Wis. Jan. 24, 2013).

While the initial "similarly situated" inquiry is lenient, "conditional certification is not a mere formality."  *Berndt*, 2013 U.S. Dist. LEXIS 91619, at *21.  Rather, "[t]he plaintiff must provide admissible evidence that the potential class members are sufficiently similar to believe a collective action will facilitate efficient resolution of a legal dispute involving claims which share common questions and common answers."  *Id*. at *21-22.  The Seventh Circuit requires such evidence because "the astronomical damages potential of many class action suits, a grant of certification may place enormous pressure on the defendant to settle even if the suit has little merit." *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 484 (7th Cir. 2012).  As a result, "[w]here the plaintiff has not made at least a modest factual showing that certification is appropriate, '[i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.'"  *Adair v. Wisconsin Bell, Inc.*, No. 08-C-280, 2008 U.S. Dist. LEXIS 68942, at *9 (E.D. Wis. Sep. 11, 2008), citing *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

Courts in this district have also applied an "intermediate level of scrutiny" where the parties have conducted significant discovery.  *Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 U.S. Dist. LEXIS 20606, at *39 (W.D. Wis. Jan. 10, 2013).  "An intermediate standard may be appropriate when a court has expressly allowed 'discovery on the issue of whether the plaintiffs are similarly situated' and the plaintiffs have been given access to a 'list of other… potential members

7

of the proposed class.'" *Freeman*, 2013 U.S. Dist. LEXIS 112871, at *11.  Here, Plaintiffs filed

their complaint on January 17, 2017.  Doc. #2.  They served Defendant with Interrogatories,

Requests for the Production of Documents and Requests for Admission.  Defendant responded to all

of those requests, which included providing Plaintiffs with the payroll records of 1,752 current and

former security officers in Wisconsin, as well as the un-redacted time sheets of all the employees

who worked special events with named plaintiffs Bessy and Woods during their employment from

July 13, 2016 through September 25, 2016.  Clearly, application of an "intermediate level of

scrutiny" is appropriate when evaluating the evidence offered by the Plaintiffs in support of their

motion.

### B.  The Proposed National Class (Overtime Rate)

#### 1.  No Support Exists For Certification Of A National Class.

In their Motion for Conditional Certification, Plaintiffs move this Court to conditionally

certify "a nationwide class of **all Per Mar employees**" for their claim that Per Mar utilized the

wrong method to calculate employees' rate of pay for overtime.  Doc. #27 (emphasis added).  They

do not describe or make any distinction about the positions the employees occupy, whether they are

entitled to receive overtime compensation, how they are compensated, the duties they perform, etc.

Instead, they ask the Court to simply "infer" the existence of a common policy based upon the

records from the Wisconsin security guards and to apply it to "all Per Mar employees." More

importantly, the only "evidence" the Plaintiffs offer in support of their request for a nationwide class

is Defense counsel's response to an email from Plaintiffs' counsel, who misrepresents what the

Parties agreed to at the August 9, 2017 hearing on Plaintiffs' Motion to Compel.  Doc. #28 at 2.

In their January 17, 2017 complaint, the Plaintiffs described the proposed class as follows:

All hourly, non-exempt security guards employed by Per Mar who, on or after
January 11, 2014, were not paid overtime pay for hours worked over 40 hours per

> week in Wisconsin, were not paid for travel time in Wisconsin to or from worksites
> located away from their home communities, were paid for their scheduled rather
> than actual hours worked in Wisconsin, or were paid at a wage rate lower than the
> rate they were promised when they were hired by Per Mar, for their work in
> Wisconsin.

Doc. #2 at ¶¶ 33-35.  In their June 9, 2017 First Amended Complaint, Plaintiffs described the

proposed class in a similar manner, again restricted to employees in the State of Wisconsin:

> All hourly, non-exempt security guards employed by Per Mar who, on or after
> January 11, 2015, had their overtime pay computed using the rate for the type of
> work performed during their overtime hours worked, were not paid for travel time in
> Wisconsin to or from worksites located away from their home communities, or were
> paid for their scheduled rather than actual hours worked in Wisconsin.

 Doc. #18 at ¶¶ 33-39.

At 3:00 p.m. on August 9, 2017, the Court conducted a hearing on Plaintiffs' Motion to

Compel (Doc. #20), which involved, among other items, a request for payroll records to which the

Defendant had objected.  During the hearing, the Court noted that the disputed discovery request

was "broader than necessary" at this stage of the litigation, and commented that Plaintiffs were "not

entitled to what you request, but more than what you got."  It then offered a compromise:  Rather

than provide the payroll records of all of the 1,752 current and former employees at all of the

Wisconsin branches, Defendant would provide a representative sample of two sets of payroll

records from each of its five Wisconsin locations.[2]  Additional discussions ensued, resulting in

Defendant's offer to provide all of the records from those branches in connection with prior

discussions with Plaintiffs' counsel about the feasibility of the continued pursuit of the claim in the

event those records demonstrated that any underpayments which may have occurred were minimal,

compared with the number of putative plaintiffs who would have been overpaid when utilizing the

method of calculation Plaintiffs were advocating (because the overtime would have occurred on a

---

[2] Defense counsel's representations are based upon his recollection and notes of the August 9, 2017
hearing.  Given that the Court participated in those discussions and is being quoted by Defense counsel,
he defers to the Court's own recollection and record of the events at the hearing. Doc. #24.

weekend, when the wage rates were generally higher) – as further evidenced by the Plaintiffs'

representation to the Court in their Memorandum in Support of Motion to Compel:

> Knowing what rates Per Mar should have, and actually used to compute other
> employees' overtime pay is indispensable to the Plaintiffs' class certification
> showing: For example, **commonality and typically would not be satisfied if other
> Per Mar employees always received their highest wages at the end of the
> workweek, so that for their overtime hours worked they received a wage rate at
> least equal to the blended straight time wage rate they earned during the
> workweek**.

Doc. #21 at 5-6 (emphasis added). See also, Doc. #31-1 ("as previously indicated, we are willing to

provide payroll information. . . for the purpose you mentioned; that is, a determination that class

pursuit of the OT claim may not be appropriate given that the majority of the affected individuals

worked their overtime hours on weekends, which is generally a higher hourly wage rate.").

Significantly, at no time during the August 9, 2017 hearing and related discussions with the

Court did Plaintiffs' counsel ever express any objection to the Court's proposed resolution or

otherwise indicate that he was seeking records from all of the Defendant's locations, not just the in

Wisconsin branches.

Just minutes after the hearing concluded, at 3:50 p.m. Plaintiffs' counsel sent Defense

counsel an email purporting to confirm his "understanding" that the Court had ordered Per Mar to

produce the payroll check history for "each of its employees…"  Doc. #31-1.  Defense counsel

confirmed that this was his understanding – that Defendant would produce all of the records agreed

upon during the hearing; that is, <u>all of the payroll records from each of the five Wisconsin branches</u>

(Seneczko Dec. ¶ 2), as further indicated when it communicated Defendant's compliance with the

Court's Order on August 18:  "Per the Court's August 9 Order, attached are the Timekeeping

reports for the Wisconsin branches."  Seneczko Dec., ¶ 3, Exh. 1.  Once again, Plaintiffs' counsel

did not object or otherwise respond to Defendant's response, or in any way suggest that it was

incomplete or inconsistent with the Court's August 9 Order.  Likewise, Plaintiffs' counsel did not take Defendant's alleged inadequate response up with this Court, which would have been appropriate because, if true, it would have been in violation of the Court's August 9 Order.

Now, however, despite alleging only a Wisconsin class in his Complaint and First Amended Complaint; not indicating or in any way suggesting that he was seeking a nationwide class or nationwide records during the August 9 hearing with the Court; expressing no objection to the Defendant's August 18 response at the time it was provided; and, failing to address Defendant's alleged noncompliance with the Court, Plaintiffs' counsel now disingenuously (at best) contends that Defendant's August 9 "confirmation" of his ambiguous email characterization of what this Court had ordered just minutes earlier should form the basis and justify certification of a nationwide class:  "Because Per Mar has failed to abide by the parties' agreement to produce time cards for all of its branches, the conditional certification order should apply to all Per Mar branches, not just its Wisconsin branches." Doc. #28 at 2.

Contrary to Plaintiffs' evidentiary tactics, certification of a nationwide class requires actual evidence that its members have actually been subjected to a common policy or practice – not a disingenuous, deceptive and misrepresentative email sent to Defense counsel, apparently and ostensibly for the purpose of "baiting" him into what he could later claim constituted evidence.  As to actual evidence in support of a national class, Plaintiffs offer none.

### 2.  Members Of The Proposed National Class Are Not "Similarly Situated."

In their Memorandum in Support, Plaintiffs urge the Court to disregard consideration of "individual questions of liability" when determining their motion. Doc. #28 at 8-9.  However, the position they now advocate is directly contrary to the position they advocated to the Court in support of their Motion to Compel, when they argued that production of extensive payroll records

was necessary because "commonality and typically would not be satisfied if other Per Mar employees always received their highest wages at the end of the workweek, so that for their overtime hours worked they received a wage rate at least equal to the blended straight time wage rate they earned during the workweek." Doc. #21 at 5-6.

Defendant produced all of the payroll records to demonstrate precisely what Plaintiffs were contending, that there was, in fact, no commonality because most of the affected employees' overtime hours occurred when they were working at higher rates of pay, as previously communicated to Plaintiffs' counsel:

> Our analysis of the data indicates a net overpayment of $682 (going back two years from the date of filing). The total amount underpaid for the 405 employees at all of the branches in Wisconsin during that period was $1,377, with just 14 employees being potentially owed more than $20, and the highest amount being $144.

Doc. #31-1.

Thus, when seeking to compel Defendant to produce extensive payroll records, Plaintiffs argued that their production was necessary because they might demonstrate that the putative class members were not "similarly situated." When those same records demonstrated just that, Plaintiffs now contend that the point is irrelevant. We believe they were right the first time, and should be taken at their word. See, *Johnson v. Bridges of Indiana*, No. 2:10-cv-153-WTL-WGH, 2010 U.S. Dist. LEXIS 103696, at *7 (S.D. Ind. Sep. 28, 2010) (putative class members found not similarly situated to named plaintiff in claim alleging failure to pay proper overtime rate despite the submission of several affidavits in support of plaintiff's claim that all of the defendant's employees were subject to the same compensation policies; "the relevant inquiry is whether the proposed class members are *denied* overtime *to which they are entitled under the FLSA*") (emphasis in original).

In support of their position, Plaintiffs also cite to *Howard v. City of Springfield*, 274 F.3d 1141 (7th Cir. 2001) for the proposition that any overpayments that would have occurred when using

12

the blended rate could not be used to offset any underpayments. However, *Howard* does not apply to this matter because it addressed to the exclusion of overtime premium payments under Section 207(e)(5)-(7), which are not an issue in this case.  Section 207(e)(5)-(7) allows premium payments for work outside established working hours (*e.g.*, work in excess of eight hours per day; on Saturdays, Sundays or holidays; outside of the employee's established hours under a collective bargaining agreement) to be excluded from inclusion in the employee's "regular rate of pay" when determining the overtime rate for any hours worked that week.  Section 207(h) further allows the employer to credit any such payments against any overtime it owes that week.  However, Plaintiffs are not pursuing this claim under Section 207(e) and (h); they are pursuing it under Section 207(g) – which is completely unrelated to the credit for premium payments covered by Sections 207(e), (h).

Lastly, given the breadth of the proposed national class ("all Per Mar employees"), it would easily encompass employees who were not paid on an hourly basis; who did not work at more than two rates of pay in any workweek; and/or, who worked fixed schedules and were thus not harmed and could not have been harmed by Per Mar's alleged FLSA violation. *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) ("If, however, a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification"); *Bell v. PNC Bank, National Ass'n*, 800 F.3d 360, 380 (7th Cir. 2015).

### C.  The Wisconsin Class (Recording Hours Worked)

#### 1.  No Admissible Evidence Exists To Support Certification Of A Wisconsin Class.

Plaintiffs also seek certification of a class of Wisconsin employees who were not compensated for all hours worked based upon an alleged unofficial policy of having supervisors complete employees' time cards and not accurately record their actual hours worked.  Docs. #27, 28

at 2.  However, the only factual evidence offered to demonstrate the existence of this alleged "unofficial policy" consists of a single declaration from one Named Plaintiff concerning the entries in the timecards for a single event, completed by a single supervisor from another branch, along with speculation from Plaintiffs' counsel about the meaning of the placement of the entries on those cards. Glaringly absent are declarations from any other employees who contend that his/her hours were not accurately recorded (contrary to their signatures on their time cards) and/or that they were not properly paid for all of the hours that they worked.

"The plaintiff must provide admissible evidence that the potential class members are sufficiently similar that a collective action will facilitate efficient resolution of common questions and common answers." *Fosbinder-Bittorf v. SSM Health Care of Wisconsin, Inc.*, No. 11-cv-592-wmc, 2013 U.S. Dist. LEXIS 91617, at *12 (W.D. Wis. Mar. 20, 2013). See also, *Adair*, 2008 U.S. Dist. LEXIS 68942 (plaintiffs must rely on admissible evidence to make the requisite factual showing for conditional certification.).  Here, the Plaintiffs' motion rests entirely on inadmissible speculation about the placement of three employees' names on the timesheets for the Eau Claire music festival from August 11-13, 2016.  They claim those individuals' hours of work were not accurately recorded because their names appeared above Bessy's, which they suggest means that they actually started at the same time or before him, and then speculate that their hours were also not recorded accurately.  Doc. #28 at 11-12.  They do not, however, provide declarations from any of those individuals stating that they did, in fact, start earlier than the times reflected on their time sheet – or that they were not properly paid for all of the hours that they worked.  Speculation is not a substitute for actual evidence, nor are conclusory assertions based upon alleged observations of other employees.  *Adair*, 2008 U.S. Dist. LEXIS 68942 ("That the plaintiffs observed other employees working outside their scheduled tours, assuming they knew their co-employees tours. . .

is. . . insufficient to support a claim these workers were subject to an illegal practice under which they were not compensated for such work.")

On the basis of the above conjecture, Plaintiffs leap to the following conclusion:

The Plaintiffs have identified a Per Mar policy, applicable to its Milwaukee, Eau Claire, and Wausau branches, of having employees sign empty time cards, and then having a supervisor or someone else fill in the start and finish times for the employee without any consultation with the employee as to the times' accuracy. The policy has resulted in Per Mar under-counting hours worked by employees from three branches.

Doc. #28 at 12. In other words, in the absence of evidence, they offer only a sweeping conclusory assertion – which is not a substitute for admissible evidence. "[P]laintiffs do not provide the Court with any factual support for the allegation that this was expected of them because of a state-wide company policy common to all members of the putative class. Conclusory allegations in the plaintiffs' reply brief to this effect . . . are simply not sufficient to make even the modest factual showing required." *Adair*, 2008 U.S. Dist. LEXIS 68942, citing, *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("unsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden") (internal citation omitted).

In his Declaration, Bessy states that Dakota Stephany "worked between about 10:30 p.m. and 10 a.m. each day" at Land O' Lakes, and "started at around the same time that I did on each of the three days that we worked at the [Eau Claire] festival," (Doc. 32 at ¶¶ 6, 10), but provides no basis for that knowledge, or any assertion that Stephany was not compensated for all of the hours that he worked. See, *LG Elecs., Inc. v. Quanta Computer Inc.*, 520 F. Supp. 2d 1061, 1064 (W.D. Wis. 2007) (disregarding portions of affidavit that lack foundation and do not rely on personal knowledge). In *Hatton v. Cablecom, LLC,* No. 14-CV-1459, 2015 U.S. Dist. LEXIS 88617, *14 (E.D. Wis. July 8, 2015), the court denied conditional certification based upon a declaration from the named plaintiff about the actions of the putative class members, which the court found

insufficient to demonstrate the existence of a common policy of failing to count time spent
answering telephone calls and emails:

> What Hatton fails to do, however, is connect how he knows that the splicers who
> were responding to emails and telephone calls while on-call also failed to record and
> get paid for the time. Hatton does not identify the splicers that were responding to
> his communications while on-call, nor does he identify the splicers he observed
> filling out time sheets. He wants me to infer that these are the same splicers. Hatton
> has not provided declarations from any other splicers stating that they were not paid
> for this time.

This is critical here because it is the same thing Plaintiffs seek:  An inference that other purported
class members were treated the same as Bessy, based solely upon the observations of Bessy.

More importantly, the actual facts demonstrate just the opposite.  First, Bessy's speculation
about Dakota Stephany's hours of work on two occasions, at the Land O' Lakes event and the Eau
Claire music festival, are contrary to the Declaration of Stephany himself, who states that his time
sheets for those events were accurate and that he was properly compensated for all of the hours he
worked.  Dec. Stephany, ¶ 6, 7, Ex. 1.

Bessy also cites to records of the Land O' Lakes assignment as "evidence" of a policy of not
accurately recording employees' actual hours of work.  Yet, those same records contain several
entries where employees' scheduled start and/or end times were, in fact, modified and corrected, so
that the employees' time sheets reflected their actual hours worked, not their scheduled hours.  See
Dec. Spangler, Exh. 3, entries of Bessy and Stephany on July 25, 26 and 27, 2016, modifying their
scheduled end times from 8:00 to 8:30; entry of ████████ on July 26, modifying his scheduled
start time from 1600 to 1530; entries of ████████████ and ████████████ on July 28, 2016,
modifying their scheduled start times from 1600 to 1530.  How do these records in any way
demonstrate the existence of an "unofficial policy" of paying employees only for their scheduled
hours of work?

A review of Bessy's timecards from June 29, 2016 through September 29, 2016 further contradicts any suggestion of an alleged "unofficial policy" of paying employees only their scheduled hours worked. Those records reveal a number of instances on which an employee's start or finish times varied from his/her scheduled times – which were then corrected and noted on the time sheet itself. For example, in the July 15, 2016 time sheet for Bastille Days, ██████████ apparently started before his scheduled start times, which was recorded and paid accurately. Likewise, ██████████ started 30 minutes before his scheduled start time at Land O'Lakes on July 26, 27 and 28, and was paid accordingly, as was ██████████, who started early on July 27. Similar actions are reflected on the timesheets for the St. Greg's festival on September 9-10, 2016 (██████████, 9/09, scheduled time, 1900, actual time, 1840; 9/10, scheduled time, 1600; actual time, 1530); and, for the September 17, 2016 Rock the Green event (██████████, ██████████ ██████; scheduled time, 1200; actual time, 1100).  Dec. Ryden, ¶ 19, Exh. 3.

Absent speculation from Bessy, all of the remaining factual evidence – from Stephany about his actual hours worked and compensation; from the actual timesheets on which he bases his claim of an alleged "unofficial policy;" from the corporate office and all of the branch managers (Dec. Ryden, ¶ 17; Dec. Spangler, ¶ 12, 14; Dec. Schaeffer, ¶ 12, 13; Dec. Pingel, ¶ 12, 13; Dec. Hubbard, ¶ 12, 13; Dec. Thacker, ¶ 12, 13), demonstrates beyond debate, that no such "unofficial policy" existed.  The undisputed admissible factual evidence all contradicts Plaintiff's claim.  Simply stated, Plaintiffs fail to make even a "modest showing" of any admissible evidence to demonstrate that they are similarly situated to potential class members, and that they are all the "victims of a common policy or plan that violated the law."

### 2. Plaintiffs' Claim Rests On Evidence Of Alleged Actions Taken By A Single Supervisor On Single Occasion, At A Single Event.

Notwithstanding the absence of any admissible evidence on which to base their claim, it is also important to note that Plaintiffs' entire position is based primarily on the entries contained in the single time sheet (which itself is different in form from all of the others), for a single event (the Eau Claire music festival), that occurred on a single occasion (August 11-13, 2016), worked by employees of various branches, and completed by single a security guard from another branch (▮▮▮▮▮▮, Wausau).  This is not sufficient to demonstrate the existence of a common policy throughout the State of Wisconsin.

In *Adair*, 2008 U.S. Dist. LEXIS 68942, *19, the court denied conditional certification because the plaintiffs "provided no facts to suggest that supervisors, other than their own, observed employees working outside their scheduled tours and permitted such conduct."  It thus held: "Alleged FLSA violations stemming from the enforcement decisions of individual supervisors, rather than a company-wide policy or plan are not appropriate for collective treatment."  *Id*. at *19-20, citing *Salinas v. O'Reilly Auto., Inc*., 2005 WL 3783598, at *6 (N.D. Tex. 2005) (plaintiffs failed to make minimal evidentiary showing required for conditional certification where their evidence showed only "that a handful of [defendant's] managers have committed possible FLSA violations in a variety of different ways," finding this insufficient to show that plaintiff and putative class members were victims of an company-wide policy or practice); and, *Flores v. Lifeway Foods, Inc*., 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) (finding that evidence of a "payment practice concerning two out of fifty employees" did not make a modest factual showing that the practice was the common policy or plan of the company).

The same considerations apply here. Plaintiffs' claim rests upon the singular actions of ▮▮▮▮▮▮ at the Eau Claire music festival from August 11-13, 2016, which is clearly insufficient

to demonstrate even a "modest showing" of the existence of a common policy applicable to all of the Wisconsin branches.

It is also noteworthy that the time sheets on which the evidentiary offer is based, those from the Eau Claire festival, differed in form from virtually all of the other timesheets that Bessy completed during the course of his employment – which usually contained columns reflecting his scheduled and actual start times, and his actual end times.  Dec. Spangler, Exh. 3. They also differed from the paper timesheets used for special events at the other branches.  See, Dec. Spangler, Exh. 2; Dec. Schaeffer, Exh. 2; Dec. Pingel, Exh. 2; Dec. Hubbard, Exh. 2; Dec. Thacker, Exh. 2.  In addition, all of the security officers who work for permanent clients – potential members of the putative class, record their hours electronically.  Moreover, the established policy at all of the branches is for the employees, not supervisors, to complete any paper time sheets, and to ensure that all of the entries are accurate and compensated based on actual hours worked.  Dec. Ryden, ¶ 10, 17; Dec. Spangler, ¶ 8, 12, 14; Dec. Schaeffer, ¶ 8, 12, 13; Dec. Pingel, ¶ 8, 12, 13; Dec. Hubbard, ¶ 8, 12, 13; Dec. Thacker, ¶ 8, 12, 13.

District courts routinely deny certification where the evidence demonstrates that the alleged violations are the result of individual decisions made on a decentralized basis.  For example, in *Hatton v. Cablecom, LLC*, the court denied conditional certification of an FLSA collective action based in part on improper deductions for lunch breaks that employees never took, finding that the plaintiff "ha[d] not shown a class-wide practice of requiring [employees] to erroneously record lunch breaks."  2015 U.S. Dist. LEXIS 88617, at *2, *17.  In doing so, the court rejected reliance upon a declaration from the plaintiff alleging that his supervisor "required them to write down a half hour lunch break even if they never took the lunch break," because it "at most, show[ed] an individual violation against [plaintiff]."  *Id*. at *19.  See also, *Martinez v. Regency Janitorial*

*Services*, No. 11-C-259, 2012 U.S. Dist. LEXIS 8941, at *11 (E.D. Wis. Jan. 26, 2012) ("Alleged

violations that are isolated to specific locations or supervisors are generally insufficient for a

company-wide collective action."); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1046 (N.D.

Ill. 2003) (denied conditional certification, where affidavits from two out of fifty employees

alleging FLSA violations did not "rise to the level of a common policy or plan. . . that violated the

FLSA. This is not even a 'modest factual showing' of a common policy or plan, as that term has

been used in other cases.").

What is alleged to have happened at the Eau Claire Festival was, at best and in the absence

of any other evidence, a one-time occurrence by a specific individual, as it related to the employees

who worked that particular event.  This "evidence" is wholly insufficient to demonstrate the

existence of a common policy or plan throughout all of the Wisconsin locations.

   **3.  Certification Of A Wisconsin Class Is Not Appropriate Because
        Resolution Of The Claim Would Require An Individual Analysis Of
        Each Member's Time Sheets And Hours Worked On Each Day That
        Each Worked.**

Even assuming, for purpose of argument, that an alleged "unofficial policy" of failing to

accurately record special event employees' hours of work existed, conditional certification should

still be denied because Plaintiffs cannot show that their situation is sufficiently similar to potential

opt-in plaintiffs, and individual issues would consume the litigation.

In *Boelk v. AT&T Teleholdings, Inc.*, 2013 U.S. Dist. LEXIS 20606, at *3, *40-41, the court

held that conditional certification of a collective FLSA action alleging unpaid meal breaks would be

improper, because "even if plaintiffs had identified a common issue," their experiences "were not

common and varied depending on their individual practices and particular supervisor."  As a result,

"individual issues would predominate. . . making the case unmanageable."  *Id.* at *3.  Similarly, in

*Ruiz v. Serco, Inc.*, Case No. 10-cv-394-bbc, 2011 U.S. Dist. LEXIS 91215 (W.D. Wis. Aug. 5,

2011), the court denied conditional certification for a collective action alleging misclassification of employees' "exempt" status.  In doing so, it held, "the answer to the common question must be susceptible to proof that can be extrapolated to the class plaintiffs seek to represent," which could not be done in the case before it, due to the "individualized inquiries arising from the wide variations in duties, experience, responsibility, discretion and supervisors on the part of the potential class members."  *Id*. at \*19.  See also, *Hatton v. Cablecom, LLC*, 2015 U.S. Dist. LEXIS 88617, at \*1, \*21 (denying conditional certification on claim alleging failure to count on-call pay and commission when calculating the regular rate of pay for overtime, because  "the earning of [the] commissions and on-call stipends [were] variable and individualized," which precluded plaintiff from demonstrating that he was similarly situated to any proposed class members."); *Hadley v. Journal Broadcast Group, Inc.*, No. 11-C-147, 2012 U.S. Dist. LEXIS 19452, at \*11-12 (E.D. Wis. Feb. 15, 2012) ("to the extent the allegation is that the company had a policy *requiring* employees to work without pay, the allegations are so individualized that there would not likely be any common answers achieved through collective litigation"); *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-cv-00738, at \*4 (S.D. Tex. Feb. 2, 2012) (denying conditional certification when "resolution of each Plaintiff's claim will require individualized inquiries about his or her specific managers' policies and practices").

Here, resolution of the "common question" would require an individualized assessment of each of 1,752 employees' timesheet entries for each day they worked, along with their individual recollections of whether the entry on that day reflected the hours he/she actually worked – despite having signed the statements confirming that they did, and that they were subsequently not paid for those hours.  "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual

question." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012), citing *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).

### D.  There Has Not Been A Showing Of Sufficient Interest In The Litigation By Members Of The Putative Class.

Plaintiffs' motion is based on the singular declaration of just one Named Plaintiff.  They have not offered a declaration from Kanasha Woods, the other Named Plaintiff, nor from any other employee from the Milwaukee branch or any other branch in the State of Wisconsin to demonstrate the existence of an alleged "unofficial policy," common to all of the Wisconsin branches. This lack of evidence reflects a "demonstrable lack of interest" that courts in this circuit have found to constitute "a strike against certification." *Hadley v. Journal Broadcast Group, Inc.*, 2012 U.S. Dist. LEXIS 19452, at *15.  See also, *Hatton v. Cablecom, LLC*, 2015 U.S. Dist. LEXIS 88617, at *15 (noting the lack of declarations from putative class members, despite the fact that he had the first and last names of the other individuals he worked with).

Conditional certification should be denied unless a plaintiff can show a sufficient interest in the litigation on the part of putative class members.  *Lance v. Scotts Co.*, No. 04 5270, 2005 U.S. Dist. LEXIS 14949, at *28 (N.D. Ill. July 21, 2005) (denying motion for conditional certification where plaintiff failed to come forward with any evidence – other than his own hearsay testimony – that other employees shared his concerns); *Levinson v. Primedia Inc.*, 2003 U.S. Dist. LEXIS 20010, at *1 (S.D.N.Y. Nov. 6, 2003) (before notice will be ordered, plaintiffs must make a "factual showing that extends beyond their own circumstances").  Filed more than seven months ago, Plaintiffs' claim for certification of a class consisting of 1,752 current and former employees – whose names and payroll records were all provided to the Plaintiffs, rests on the Declaration of a single Named Plaintiff.  This does not constitute a showing of interest sufficient to establish the basis of a class of Wisconsin employees.

### E.  The Proposed Notices

#### 1.  Any Information Or Notices Should Be Limited To Employees Similarly Situated To The Named Plaintiffs

Plaintiffs ask this Court to order Per Mar to produce "a list of all employees who worked for it on or after January 13, 2014."  Doc. 27 at ¶ 2.  Clearly, this request bears no relationship to the purported national and Wisconsin classes (those "similarly situated to the Named Plaintiffs"), nor to the claims that underlie those actions.  Likewise, they request that Notices be sent to "all hourly job site employees of Per Mar," which again bears no relationship to the Named Plaintiffs or the claims at issue here.

As discussed above, there is no evidentiary basis for certification of a national class. To the extent conditional certification may be granted relative to the overtime rate issue, it should be limited to special event employees in Wisconsin. Permanent uniformed guards perform services for permanent and temporary clients at set locations on a regular and continuing basis, with established work schedules and hours of work, and they record their time electronically.  In essence, they bear no relationship to the Named Plaintiffs, two special event employees out of the Milwaukee branch. On the other hand, special event employees work a variety of events, with no fixed schedules or hours, differing rates of pay, and they record their hours of work manually, on paper. For purposes of any claim based upon the calculation of the overtime rate of pay, the only employees at the Wisconsin branches who are or may be similarly situated to the Named Plaintiffs are **special event employees who worked at more than one rate of pay during the course of a workweek**.

Similar considerations apply to any Wisconsin class based upon the alleged "unofficial policy" of not accurately recording employees' hours of work. Although no basis for certification exists for the reasons discussed above, to the extent certification may be granted, it should be limited to **special event employees whose hours of work were recorded manually,** as opposed to

electronically, through TeamTime or eHub Mobile. Plaintiffs have not provided any evidence that any employee's hours of work – including the Named Plaintiffs, were not accurately recorded through the electronic timekeeping systems.  As a result, there is no basis for including them in any class notice, which should, again, be restricted only to employees who worked special events.

> **2.   The Notice Should Be Limited To Employees Who Worked For Per Mar During The Two-Year Period Preceding The Date The Court Grants Conditional Certification.**

Plaintiffs request that notices be sent to all job site employees who worked for Per Mar "on or after January 13, 2014," which is overbroad. First, although Plaintiffs assert Defendant's actions were willful, warranting a three-year limitations period, the evidence offered in support of the motion demonstrates just the opposite.  At best, Defendant used an erroneous formula for calculating the employees' rate of pay for overtime purposes, which, more often than not, resulted in an overpayment of compensation, not an underpayment.  Notice should therefore be limited to the traditional two-year period.

The Plaintiffs have offered no evidentiary basis for dating a notice period back to January 13, 2014.  Even if the Court finds that the notice period should be three years, it should be three years from the date of conditional certification (or later, as determined by the court), not January 14. "Because an opt-in plaintiff is deemed to have commenced his or her claim when he or she files notice of consent to join the collective action, the notice should reflect that only those individuals who worked for [the employer] within three years of the date on which the notice is sent are potentially eligible to join the class."  *Salmans v. Byron Udell & Associates*, No. 12 C 3452, 2013 U.S. Dist. LEXIS 28073, at *19 (N.D. Ill. Feb. 26, 2013).

### 3.  The Contents Of The Proposed Notice

In the "Description of the Lawsuit" in the proposed notices for the purported national class

and the Wisconsin class based upon the calculation of overtime rate, the Plaintiffs state:

> The lawsuit alleges that you should be allowed to keep all overtime pay that you
> received from Per Mar, plus all additional overtime pay you would have received,
> had Per Mar used the average straight time wage rate you earned to compute your
> overtime pay each and every week.

Doc. #27-1 at 1.  Not only does the lawsuit not "allege" this, the statement is inaccurate and should

not be included in the notice.

As discussed above, the authority on which Plaintiffs rely for their contention that any

overpayment of overtime compensation may not be used to offset any underpayment, *Howard v.*

*City of Springfield, supra,* does not apply because it deals with a completely different section of the

statute. In fact, it is ludicrous to suggest that Defendant must, in effect, pay two overtime rates – the

"type of work" rate, when it favors employees, and the "blended rate," when it does not. If the

blended rate was the appropriate method by which to calculate employees' overtime rate of pay,

then it will apply, or should have applied "across the board," including any potential overpayments.

Undoubtedly, this is and will be a point of contention for the parties for the court to decide at some

future point, which only exemplifies why the above statement must not be included in the proposed

notice. If it is, then Defendant must be allowed to offer an additional sentence concerning potential

overpayments.

Defendant further contends that the preceding sentence should be amended as follows:

"The lawsuit alleges that Per Mar was required by federal law to compute your overtime pay using

the average straight wage rate you made during the workweek, rather than the rate for the type of

work you performed during work hours, which may or may not have resulted in an underpayment

of overtime compensation depending on the rate of pay that you received at the time you worked the

overtime."

In the proposed Wisconsin notice, Plaintiffs state that the lawsuit alleges that Per Mar "did not correctly count your hours worked each day, especially when you worked longer hours than your scheduled hours." This statement not only inaccurately summarizes the nature of the claim, it is also overbroad and deceptive. It leads putative class members to believe that Per Mar inaccurately recorded their hours of work regardless of the timekeeping mechanism that was utilized. However, the entire claim is based upon the handwritten timesheets of employees who worked special events. Plaintiffs have produced no evidence that any records generated through the TeamTime or eHub Mobile electronic timekeeping systems were inaccurate. As a result, the description of the lawsuit should be amended to state:

> The lawsuit alleges that when manually recording the hours you worked at special events, Per Mar did not always correctly count the actual hours you worked each day, especially when you worked longer hours than your scheduled hours, which Per Mar denies. The lawsuit alleges that you are owed overtime pay for any weeks in which your timesheet did not accurately reflect the hours you worked, and those additional hours would have caused your total for the week to exceed 40.

Lastly, Plaintiffs' proposed notices fail to adequately explain to the putative class members their options with respect to retaining other counsel or bringing an individual lawsuit. Notice forms approved by courts in this circuit often include a statement advising putative class members of their right to counsel of their own choice. *See*, *e.g.*, *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, No. 08-C-488, 2008 U.S. Dist. LEXIS 102318, at *19-20 (E.D. Wis. Dec. 17, 2008) ("If you decide to join this case, you have the right to hire your own lawyer. You may elect to have Plaintiffs' Counsel represent you or you may retain another attorney. It is your decision.")

## IV.    CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court deny Plaintiffs'

Motion for Conditional Certification, in its entirety, and grant such other and further relief as this

Court deems proper.

Respectfully submitted this 19th day of September, 2017.

By:    s/ Alan E. Seneczko
Alan E. Seneczko, State Bar No. 1003523
Peter E. Hansen, State Bar No. 1083271
Attorneys for Defendant, Per Mar Security and
Research Corp
Wessels Sherman Joerg Liszka Laverty Seneczko P.C
1860 Executive Drive, Suite E-1
Oconomowoc, Wisconsin 53066
Email:  alseneczko@wesselssherman.com
        pehansen@wesselssherman.com
Phone:  (262) 560-9696
Fax:  (262) 560-9677
